UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

AURORA WININGER,

        Plaintiff,

        v.                          Case No.  3:21-CV-956-CCB

FOREST RIVER MANUFACTURING,
LLC,

        Defendant.

## OPINION AND ORDER

       Aurora Wininger sued her former employer, Forest River Manufacturing, LLC[1], ("Forest River"), under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*  Wininger alleges that after reporting an alleged sexual assault by a coworker outside the workplace, she experienced a sexually hostile work environment, was constructively discharged due to her sex, and was retaliated against for reporting the alleged assault to Human Resources at Forest River.  Forest River now seeks summary judgment on all Wininger's claims.

       This Court has subject matter jurisdiction because Wininger's case arises under a federal statute.  28 U.S.C. § 1331.  Based on the applicable law, facts, and arguments, Forest River's motion for summary judgment will be granted.

## I.    RELEVANT BACKGROUND

       The following facts are largely not in dispute.  Any disputed facts are either not material or will be addressed in the substantive analysis below.

---

[1] Wininger sued her former employer, Forest River Manufacturing, LLC.  At her deposition, Wininger admitted she worked for Forest River, Inc., not Forest River Manufacturing, LLC.  [DE 24-1 at 10].  Human Resources Director, and In-House Counsel, David Besinger, stated the same in his Declaration.  [DE 24-2 at 2].  Forest River Manufacturing, LLC disclosed that it is a wholly owned subsidiary of Forest River, Inc., a wholly owned subsidiary of the publicly traded corporation, Berkshire Hathaway, Inc.  [DE 6].  No party challenges Forest River Manufacturing, LLC as the named defendant.  The Court will refer to "Forest River" throughout this Opinion and Order.

Wininger was hired by Forest River, a recreational vehicle manufactuer, in September 2020 to work as a West Coast Class A Parts Representative in Division 41.  [DE 24-2 at 1, 9].  Her direct supervisor was Cameron Bigler, the Division 41 Parts Manager, who reported to John Hilliard, the Parts/Service/Warranty Manager, who reported to Daniel Evans, the General Manager who oversaw all Division 41 employees.  [DE 24-1 at 10; DE 24-3 at 2].  When she was hired, Wininger acknowledged receipt and understanding of Forest River's employee handbook, which includes an Equal Employment Opportunity, Anti-Discrimination, and Anti-Retaliation Policy ("Anti-Harassment Policy").  [DE 24-2 at 3; DE 24-1 at 23–25].  Forest River's Anti-Harassment Policy provides a procedure for employees to report complaints of harassment as follows.

> [Forest River] supports and encourages reporting of all incidents of discrimination or sexual harassment, regardless of who the offender may be.  If you experience unlawful discrimination or harassment, or observe such conduct, you are encouraged and responsible for promptly reporting the matter to your immediate supervisor as well as the head of your department.  If, however, you believe that it would be inappropriate to discuss the matter with your immediate supervisor, you may bypass your immediate supervisor and report it only to the head of your department, the Human Resources Department, or to the [Forest River] Chief Ethics and Compliance Officer or his deputy/delegate.

[DE 24-2 at 3].

Another Forest River employee, Ryan Stratton, worked as a Class C Warranty Representative and reported directly to John Hilliard.  [DE 24-3 at 4].  Wininger and Stratton worked on different vehicle class lines from different manufacturing plants.  [DE 24-3 at 4].  While they never worked together on any Forest River matter, their workstations were about 20 feet from each other.  [DE 24-1 at 16; DE 24-3 at 4].  Wininger's desk was one of four in a cubicle separated by a dividing wall that did not extend all the way to the ceiling from the four-desk cubicle where Stratton sat.  [DE 38-1 at 4–7].

In the winter of 2020–2021, Wininger developed a friendship with Stratton.  [DE 24-1 at 43].  Soon they were talking almost daily by text message.  [*Id.* at 42].  Wininger sought help from

Stratton when she felt physically threatened by someone she dated, needed a babysitter for her daughter, needed help paying her bills, and confronted anxiety compounded by health and legal issues unrelated to this case. [*Id.* at 46–54]. Eventually, they decided to go on a date.

On February 5, 2021, they met at Wininger's home where they smoked marijuana before going out for dinner and drinks at two bars. [*Id.* at 66–67]. The evening ended with a sexual encounter at Wininger's home. The parties dispute whether the encounter was consensual. Text messages continued between them from February 5th through February 12, 2021. In one of the texts, Wininger informed Stratton that she "felt like [he] raped [her]." [*Id.* at 78]. Wininger found the texts, sent to her while she was at work, to be harassing especially after she had asked him to stop. [DE 26 at 10]. At work that week, Wininger cried at her desk and ended up hiding in the bathroom because she was crying and experiencing panic attacks. [DE 24-1 at 35]. She had also cried at work in January and February 2021 before the alleged sexual assault. [DE 38-1 at 9–10].

Through multiple emails on February 15, 2021, between 8:16 a.m. and 8:29 a.m., Wininger reported a "workplace related sexual assault" to Human Resources personnel at Forest River. [DE 24-2 at 16]. Her report included a narrative of the alleged assault by Stratton on February 5th, as well as part of her text message history with Stratton. [*Id.* at 4]. By 8:47 a.m., Human Resources emailed Wininger informing her that her report had been forwarded to Human Resources Director and In-House Counsel, David Besinger, and Corporate Human Resources Manager, Dale Huyvaert. [*Id.*; DE 24-1 at 94]. Besinger emailed Wininger at 9:48 a.m. scheduling a meeting with her later that morning to discuss the allegations in her report. [DE 24-2 at 4–5]. In preparation for the meeting, Besinger and Huyvaert reviewed Wininger's narrative account and the text messages she submitted with her report. [*Id.* at 5].

Wininger met with Besinger and Huyvaert at 10:30 a.m. [*Id.*]. During the meeting, Wininger requested that Stratton be relocated to another workstation. [*Id.*; DE 24-1 at 99]. Besinger and

Huyvaert refused to take any action before interviewing Stratton. [DE 24-1 at 99; DE 24-2 at 5]. They did, however, ask Wininger if she would like to be relocated. [DE 24-2 at 6]. She declined because had just learned her job position and did not feel like she should be punished because of the alleged assault. [*Id.*; DE 26 at 11; DE 39 at 12[2]]. Besinger and Huyvaert also informed Wininger that the alleged assault occurred outside work and may be a police matter. The parties dispute whether Besinger and Huyvaert suggested Wininger file a police report but agree that Wininger was given the rest of that day off. [DE 24-2 at 6; DE 24-1 at 101]. Wininger perceived Besinger and Huyvaert as argumentative during the meeting making her feel that they were biased against her. [DE 24-1 at 132].

Immediately after meeting with Wininger, Besinger and Huyvaert met with Stratton about the alleged assault reported by Wininger. [DE 24-2 at 6]. Stratton's direct supervisor, Mr. Hilliard, also spoke with Stratton about the alleged assault. [DE 24-3 at 4]. While Stratton's workstation was not relocated, Besinger and Huyvaert instructed Stratton not to contact Wininger and to avoid all interaction with her. [DE 24-2 at 6]. Stratton's last text message to Wininger was on Friday, February 12th, before she made her report on Monday the 15th. [DE 24-1 at 213]. He also blocked Wininger on Facebook. [*Id.*]. Even though they did not work directly together, they saw each other at work daily given the proximity of their workstations but never exchanged text messages or spoke directly again. [*Id.* at 113].

After Wininger reported the alleged assault, Stratton would pass by her desk with a group of guys laughing and being obnoxious. [*Id.* at 110]. None of them spoke directly to her. [*Id.*].

---

[2] In the Statement of Material Facts, Wininger cites many times to her Exhibit A, which she identifies as her deposition transcript in her Designation of Evidence. [DE 32 at 1]. Yet the document attached to her Designation of Evidence and labeled as Exhibit A is her Affidavit, not her deposition transcript. [DE 28]. Some of Wininger's deposition references can be found in the deposition transcript excerpts filed by Forest River, but not all. [DE 24-1, 38-1]. Therefore, some of Wininger's assertions of fact are not supported in the record. That said, construing Wininger's statement of material facts in the light most favorable to her, the Court recites some of the unsupported facts she references for context because they will not be determinative in the subsequent analysis.

Wininger did not know what they were talking or laughing about but believed they were laughing at her. [*Id.* at 111]. During the same time, the Forest River receptionist, Cara Lee, who had always been friendly to Wininger stopped talking to her. [*Id.* at 121]. Then, at some unknown point, Wininger received a direct message on Facebook from a user identified as "Brock Smith." [DE 24-4 at 4]. The message used vulgar language and appeared to react to Wininger's report about Stratton. [DE 24-1 at 216–18]. Not knowing anyone named Brock Smith, Wininger believed her coworker Brittany Tomlinson had penned the message, using a fictitious username, based on the style of dialogue and her "work wife" relationship with Stratton. [DE 24-4 at 4].

Wininger continued to cry at her desk, hide in the bathroom, and experience panic attacks. [DE 39 at 16–18]. Her supervisors noticed that she cried at her desk but did not ask her anything about it. [DE 38-1 at 9–10]. Wininger felt harassed by coworkers, experienced anxiety from working near Stratton, and believed that Forest River had done nothing in response to her report. As a result, she arrived late to work, left early, and took long lunches in late February and early March, allegedly with permission. Manager Hilliard issued a Personnel Action Notice on March 11, 2021, memorializing a verbal warning to Wininger about her being late, leaving early, and taking long lunches every day between March 1 and 5, 2021. [DE 24-3 at 6]. Wininger did not return to work after Friday, March 12, 2021. [DE 24-1 at 8]. She sent a text message to Hilliard advising him that she could not continue working for Forest River. [*Id.* at 9]. After Wininger did not show up for work on March 15th and 16th, Hilliard issued another Personnel Action Notice on March 16, 2021, checking the "Quit <u>With</u> Notice" box and commenting that Wininger "was a 'no call-no show' on both Monday March 15 and Tuesday March 16, 2021." [DE 24-3 at 7].

On March 25, 2021, Wininger called the Berkshire Hathaway, Inc. Ethics & Compliance Hotline. [DE 30]. In a System Report explicitly noting that "Alleged Facts are Unsubstantiated and Confidential," Wininger's report was summarized as follows: "[Wininger] was sexually harassed by

[Stratton], and [Wininger] has since felt unsafe whenever at work." [*Id.* at 1]. The System Report detailed the alleged assault on February 5, 2021, and stated that the alleged assault made Wininger "really uncomfortable and uneasy being around Ryan afterward" including making her feel unsafe and uncomfortable when she saw him at work leading her to "become sick, [begin] hiding in the bathroom, and [state] that she was not feeling safe at work." [*Id.* at 2]. The System Report does not mention the Wininger/Stratton text messages between February 5th and 12th but states that Wininger requested Stratton's relocation because "his presence made [her] feel uneasy, and [he] did not create a safe working environment for [her]." [*Id.*]. The System Report concludes noting that Wininger stopped working at Forest River on March 15, 2021, because "HR refused to do anything to assist [Wininger] or to make her feel safe at work" despite her report to management. [*Id.*]. The follow-up on March 29, 2021, from someone identified as David Youmans, says:

> I'm sorry to hear about the incident, however this is not a work-related matter. You should report this to law enforcement.

[*Id.*].

On May 5, 2021, Wininger submitted a Charge of Discrimination based on sex to the Equal Employment Opportunity Commission. In the Charge, Wininger described the alleged assault, Forest River's response to her report, and the panic attacks and depression she continued to experience before she "left employment at Forest River on March 15, 2021. [DE 25-1 at 1]. Wininger received a notice to sue on September 22, 2021, then initiated this lawsuit within 90 days on December 18, 2021. [DE 1-3].

On this record[3], Forest River now seeks summary judgment on Wininger's Title VII sexual harassment, constructive discharge, and retaliation claims.

---

[3] Wininger's response brief suggests that she filed a police report after her February 15th report to Forest River. [DE 33 at 11]. Wininger cites "Ex. F," which she identifies in her Amended Designation of Evidence as "Plaintiff's First Documents Produced in Response to Defendant's First Request for Production, Police Report." [DE 32 at 1]. But Wininger's Exhibit F is a copy of her Complaint. [DE 25-11]. None of Wininger's other exhibits include anything

## II.    ANALYSIS

### A.    Summary Judgment Standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matshushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To determine whether a genuine dispute of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). The court must not "sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). The court does not have to conduct research or develop arguments for parties either. *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011); *see also United States v. Beavers*, 756 F.3d 1044, 1059 (7th Cir. 2014) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived." (quoting *Mahaffey v. Ramos*, 588 F.3d 1142, 1146 (7th Cir. 2009))).

"To defeat a motion for summary judgment, the non-moving party cannot rest on the mere allegations or denials contained in his pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (internal quotations omitted), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). "Summary judgment is not a dress rehearsal or practice run; it is the put up or shut up moment in a lawsuit, when a party must show what

---

resembling a police report. Any police report is irrelevant to the subsequent analysis such that its existence need not be clarified.

evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted); *see also Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

**B.    Sexual Harassment**

According to Wininger, Stratton's alleged sexual assault on February 5, 2021, was unwelcome, based on her sex, and led to unwanted texts to her at work between February 5th and 12th causing her to submit a complaint under the Anti-Harassment Policy to Forest River on February 15, 2021.[4]  Wininger describes feeling harassed and unsafe at work until she ended her employment at Forest River in mid-March 2021 because of how Forest River responded to her complaint and how coworkers behaved toward her after the complaint.  To establish harassment based on these facts, Wininger "must show: (1) unwelcome harassment; (2) based on a protected characteristic; (3) that was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive working environment; and (4) a basis for employer liability." *Demkovich v. St. Andrew the Apostle Par., Calumet City*, 3 F.4th 968, 977 (7th Cir. 2021); *see also Whittaker v. N. Ill. Univ.*, 424 F.3d 640, 645 (7th Cir. 2005).  While Wininger can likely show subjectively unwelcome harassment, she has not presented evidence establishing a genuine dispute of material fact as to any other necessary element of her sexual harassment claim.

**1.    Protected Characteristic**

Harassment is based on sex where males and females in the same setting are treated disparately. *Pasqua v. Metro. Life Ins. Co.*, 101 F.3d 514, 517 (7th Cir. 1996).  Sexist conduct arising from "anti-female animus" can also support a hostile work environment claim. *Scruggs v. Garst Seed Co.*, 587 F.3d 834, 840 (7th Cir. 2009).

---

[4] Wininger's response brief references dates in 2023 even though the record otherwise confirms that the key events all occurred in 2021.  [*See, e.g.*, DE 33 at 11].  The Court proceeds assuming the 2023 references are scrivener's errors.

8

Wininger presents no evidence to show she was treated differently than males at Forest River or to link Forest River's Anti-Harassment Policy, its response to her complaint, or her coworkers' conduct after the complaint to any "anti-female animus." Wininger only argues that her harassment claim is based on sex because she did not welcome the sexual encounter with Stratton on February 5, 2021, or his subsequent text messages. Yet an employer such as Forest River can only be liable for nonconsensual sex between coworkers outside the workplace when the employer is negligent in failing to control working conditions or protecting employees from predatory coworkers. *Vance v. Ball State Univ.*, 570 U.S. 421, 424 (2013); *Doe v. Oberweis Dairy*, 456 F.3d 704, 715–16 (7th Cir. 2006). Wininger admits that she understood Forest River's Anti-Harassment Policy and that she reported the alleged assault and subsequent text messages in line with that Policy. She also presents no evidence that Forest River negligently failed to protect her from the alleged assault or the week's worth of subsequent text messages. Having waived any other arguments of disparate treatment or anti-female animus, Wininger has not established any genuine dispute of material fact as to whether the alleged harassment was based on the protected characteristic of her sex.

### 2. Severe or Pervasive Harassment

Unwelcome harassing conduct can only create a hostile work environment if the unwelcome conduct is "severe or pervasive from both a subjective and an objective point of view." *Howard v. Cook Cnty. Sheriff's Off.*, 989 F.3d 587, 600 (7th Cir. 2021); *see also Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998). "To be severe or pervasive enough to create a hostile work environment, conduct must be extreme." *Howard*, 989 F.3d at 600 (internal quotations and citations omitted). The conduct must be "so severe or pervasive as to alter the conditions of [the victim's] employment and create an abusive working environment." *Faragher*, 524 U.S. at 786. "Whether a work environment is hostile depends on all the circumstances, including the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

9

offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Howard*, 989 F.3d at 600 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 22 (1993)); *see also Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 677–78 (7th Cir. 2005). "[I]solated and minor incidents of questionable conduct generally will not warrant a conclusion of sexual harassment." *Hilt-Dyson v. City of Chicago*, 282 F.3d 456, 463 (7th Cir. 2002).

Wininger appears to base her sexual harassment claim on (1) Stratton's text messages to her between February 5th and 12th, (2) Besinger and Huyvaert's interactions with her at the February 15th meeting, (3) Forest River's actions, or lack of action, after that meeting, (4) her coworkers' conduct toward her after her complaint, and (5) the "Brock Smith" Facebook message. As discussed below, the totality of facts and circumstances underlying these allegations do not rise to severe or pervasive conduct sufficient to create a hostile work environment.

First, the unwanted text messages Stratton delivered to Wininger after the alleged assault continued after Wininger asked him to stop sending them. Yet Wininger admits that she received the last of Stratton's texts on February 12, 2021—one week after the alleged assault. She also describes the tone of one of Stratton's texts as remorseful and apologetic in her Statement of Additional Material Facts where she quoted at least three of Stratton's texts to support her conclusion that "Stratton admitted that he sexually assaulted [her]." [DE 39 at 5–6]. While the unwanted texts from Stratton affected Wininger's work performance that week and led to her report on February 15th, their effect was limited in time and scope by Stratton's decision to stop communication with Wininger before Forest River directed him to do so. As a result, no reasonable jury would find that the Stratton text messages between February 5th and 12th, 2021, were severe or pervasive.

Second, Wininger contends that at the February 15th meeting regarding her complaint against Stratton, Besinger and Huyvaert argued with her about her allegations and favored Stratton.

Wininger's subjective view of Besinger's and Huyvaert's tone as argumentative alone is not enough to establish severe or pervasive conduct. Objectively, Besinger's and Huyvaert's conduct during the meeting was reasonable based on facts Wininger has not disputed. Wininger does not dispute that Besinger and Huyvaert reviewed her text message history with Stratton before the meeting. She interprets those messages differently than they do but does not provide any evidence that Besinger and Huyvaert's conclusion from those texts—that a dispute existed as to whether the sexual encounter had been consensual[5]—was made in bad faith. Wininger does not like that Besinger and Huyvaert refused to take remedial action against Stratton before interviewing him but presents no evidence or authority to suggest that delaying action until after hearing from both Wininger and Stratton was in anyway improper. Wininger wanted Forest River to immediately grant her request to relocate Stratton but presents no authority suggesting Forest River was required to do as she asked. Wininger focuses on the distress she experienced working near Stratton after the alleged assault. But she did not take advantage of the opportunity Besinger and Huyvaert gave her to move her workstation away from Stratton. Despite Wininger's allegations, she has presented insufficient evidence from which a reasonable jury could find Besinger and Huyvaert's conduct at the February 15th meeting unreasonably interfered with her work performance, evaluations, or pay or was physically threatening, humiliating, or intimidating. *See Faragher*, 524 U.S. at 787.

Third, Wininger contends that Forest River did nothing in response to her complaint. Yet she acknowledges that she was interviewed the morning of her report; that she had a chance to relocate her workstation; that she was given the rest of February 15th off; that Stratton was interviewed the same day; and that Stratton was instructed not to contact her and avoid all interaction with her. Wininger even admits that Stratton never texted or spoke with her directly

---

[5] This Court need not, and will not, decide whether Wininger and Stratton engaged in consensual sex on February 5, 2021, to assess the severity or pervasiveness of harassing conduct relevant to Wininger's sexual harassment claim.

after February 12th and even blocked her on Facebook. Even still, she complains that her concerns were not taken seriously, and she was not given any other options to address the anxiety, distress, and inability to work she experienced sitting near Stratton. An employer's remedial action in response to an employee's complaint about harassing conduct must be "reasonably likely under the circumstances to prevent the conduct from recurring." *Tutman v. WBBM-TV, Inc./CBS, Inc.*, 209 F.3d 1044, 1049 (7th Cir. 2000). By offering Wininger a chance to relocate and ordering Stratton not to contact Wininger in any way, Forest River responded to Wininger's complaint with remedial action that was "reasonably likely" to, and actually did, prevent recurring contact from Stratton. Wininger presents no evidence or authority to show Forest River was responsible for her choice not to relocate when given the option. With nothing more, Wininger has not created a genuine dispute of material fact that Forest River was negligent in addressing her complaints about Stratton.

Fourth, Wininger asserts that her coworkers treated her differently after the complaint. "[E]mployers generally do not face liability for off-color comments, isolated incidents, teasing, and other unpleasantries that are, unfortunately, not uncommon in the workplace." *Swyear v. Fare Food Corp.*, 911 F.3d 874, 881 (7th Cir. 2018). "[O]ccasional vulgar banter, tinged with sexual innuendo of coarse or boorish workers generally does not create a work environment that a reasonable person would find intolerable" either. *Hilt-Dyson*, 282 F.3d at 463. According to Wininger, her coworkers supported Stratton as shown by their refusing to talk with her, lunch with her, or otherwise interact with her directly at work. She also suspected, without knowing, that Stratton's "gang of followers" who gathered around his desk were laughing at her and talking about her. Wininger's coworkers' conduct may have been unpleasant, but she presents no evidence that the behavior was threatening or otherwise abusive or intolerable so as to constitute severe or pervasive, harassing conduct.

Lastly, Wininger cannot link the "Brock Smith" Facebook message to the workplace in any material way. Wininger has no evidence, besides her own hunch, to identify who sent the admittedly

vulgar message. Thus, she has not established that the author of the message was a coworker whose conduct is relevant to this Title VII sexual harassment claim against her employer, Forest River. Similarly, Wininger does not recall when she received the Brock Smith message and has not presented any other evidence from which to determine whether she received it while she was still working at Forest River.

On the entire record before this Court, Wininger has not established any genuine disputes of material fact about the severity or pervasiveness of allegedly harassing conduct she experienced at Forest River from the alleged assault on February 5, 2021, through March 16, 2021, when she stopped working there. Her experiences do not demonstrate a work environment "permeated with discriminatory ridicule, intimidation, and insult." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 982 (7th Cir. 2014) (quotations omitted).

### 3.    Basis for Employer Liability

The final element of Wininger's Title VII sexual harassment claim is a basis for employer liability. *Demkovich*, 3 F.4th at 977. Employers can be liable for harassment by coworkers and supervisors, but the applicable standard is different for each. *Vance*, 570 U.S. at 424. When an employee is harassed by a coworker, the employer is liable only if it is "negligent either in discovering or remedying the harassment." *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 904 (7th Cir. 2018). Supervisors, or individuals "empowered by the employer to take tangible employment actions against the victim," who harass an employee are strictly liable if they take a tangible employment action. *Vance*, 570 U.S. at 424. "[I]f no tangible employment action is taken, the employer may escape liability by establishing . . . that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Id.*

According to Forest River, Wininger has only alleged coworker harassment. Forest River argues that it is not liable here because its response to Wininger's only report of harassment was prompt and reasonable and it lacked notice of any other acts of harassment. The record is clear that during her employment at Forest River, Wininger made only one report of harassment to Human Resources on February 15, 2021, complaining about the alleged assault by Stratton on February 5th and his text messages from February 5th through 12th. No party disputes that Forest River investigated Wininger's complaints the same day by reviewing her narrative account of events and the text history included with the complaint, interviewing both Wininger and Stratton, offering Wininger the opportunity to relocate, directing Stratton to avoid all contact with Wininger, and giving her the rest of the day off. Wininger wanted Forest River to relocate Stratton but does not dispute that Stratton sent no texts and made no effort to communicate with her after February 12th. Wininger also admits that she made no further reports to Human Resources or her supervisors about the changes in her interactions with coworkers, her anxiety and emotional distress working near Stratton, her feeling unsafe at work, or any other unwelcome conduct after February 15th.

Based on this undisputed evidence, Forest River had no reason to believe that its response to Wininger's February 15th complaint had not been effective. *See Henyard v. MV Transp. & Pace*, 856 F. App'x 612, 614 (7th Cir. 2021). Nor was Forest River aware of Wininger's concerns about the work environment after February 15th. An employer has no duty to act regarding alleged harassment of an employee without notice or knowledge of the alleged harassment and cannot be held liable for any alleged harassment for which it has no notice. *Bernier v. Morningstar, Inc.*, 495 F.3d 369, 373–74 (7th Cir. 2007). To avoid summary judgment, Wininger must therefore present evidence that she gave Forest River evidence from which it could reasonably think there was some probability that she was being sexually harassed. *Id.* at 374. She has not.

In addressing Forest River's arguments on the basis of employer liability, Wininger presents only four sentences with citations to an excerpt from her deposition testimony and two exhibits. She uses her deposition testimony to support her statement that she "reported her complaints to HR on February 5, 2021." [DE 33 at 17]. There is no doubt she reported her complaints to Human Resources; this part of her response brief just references the date of the alleged assault rather that the date of her report, which was February 15, 2021. She does not mention or argue about reports to Forest River of other unwelcome conduct after February 15th and before March 16, 2021—her last day of employment at Forest River.

The remaining three sentences of her argument essentially assert that Forest River took no action despite knowing that she was still crying and suffering at work after the February 15th report. Wininger specifically notes that Hilliard did not reach out to her after she texted him on March 16th informing him "she was still suffering from the work environment . . . ." [*Id.*]. Yet the record before this Court does not include the March 16th text message to Hilliard.[6] In her Affidavit, Wininger merely states, without citation:

> I texted John Hilliard on March 16, 2021[,] and stated the following: "I can't continue to work for you. Nobody wants me to feel safe at work so I can't do it anymore."

[DE 28 at 2]. She has not provided the alleged text message to the Court or to Forest River despite its request after her deposition. [DE 38 at 15]. In fact, Forest River asks the Court to exclude the portion of Wininger's Affidavit citing the March 16th text message arguing that it contradicts her deposition testimony. Such exclusion is unnecessary because even if Wininger texted this exact message to Hilliard on March 16th as she says, it came on Wininger's official last day of work at Forest River, which was two workdays after her last actual day on the job on March 12th. Thus,

---

[6] The only text message to Hilliard in the record is Wininger's Exhibit M, which must have been sent on February 15, 2021, because it states that Wininger sent it "to make sure [Hilliard was] aware that [Wininger] had to go to HR and police station after [her] break and HR told [her] it was ok to take today off to handle what I needed to." [DE 25-10].

Forest River was unaware of any possibility of allegedly harassing conduct after the February 15th report and before her departure on March 16th. As a result, Forest River had no duty to take further corrective action on Wininger's behalf.

In her final sentence, Wininger states that Forest River did not reach out to her to offer options besides her own relocation after she filed a report with the Berkshire Hathaway Ethics Hotline. [*Id.*]. In support, Wininger inexplicably cites the Brock Smith Facebook message, her Exhibit E, and nothing else. [*Id.*]. Wininger's report to the Hotline occurred on March 25, 2021. [DE 30]. The resulting System Report, including the response from a person named David Youmans that has not been otherwise identified in the record, was dated March 29, 2021. [*Id.*]. There is no evidence of when Forest River would have learned of this System Report or Youmans' response, but it could not have been before Wininger stopped working at Forest River on March 16th. With nothing more, Wininger has not met her burden to show that Forest River knew about the possibility, let alone the probability, that Wininger was being sexually harassed after February 15, 2021. *See Bernier*, 495 F.3d at 374.

Buried inside Wininger's four sentences of argument about the basis for any liability on behalf of Forest River is what looks like a challenge to Hilliard's decision to deem her "voluntarily quit" under the attendance policy. [DE 33 at 17]. Wininger cites her Exhibit K, Hilliard's Personnel Action Notice dated March 16, 2021, in support but does not explain how this shows Forest River is negligent in discovering or remedying any sexual harassment. *See Johnson*, 892 F.3d at 904. Wininger also makes no argument that Forest River is subject to strict liability for supervisor harassment. *See Vance*, 570 U.S. at 424. Wininger has thus waived these undeveloped arguments and has not established any genuine dispute of material fact as to the basis of employer liability.

Wininger has not presented sufficient evidence to show the existence of each element of her Title VII sexual harassment claim. *See Robin*, 200 F.3d at 1088. As a result, a reasonable jury could

not find in her favor.  *See Anderson*, 477 U.S. at 248;*Matshushita Elec. Indus. Co.*, 475 U.S. at 587.

Accordingly, Forest River is entitled to judgment as a matter of law and summary judgment on the

sexual harassment claim.

### C.    Constructive Discharge

Wininger also raises a sex discrimination claim against Forest River based on allegations that

she was constructively discharged due to her gender.  *See* 42 U.S.C. § 2000e-2.  Wininger says that

she was forced to quit her job at Forest River on March 16, 2021, because she felt unsafe at work.

According to Wininger, Forest River never followed up with her after her February 15th complaint

about the alleged sexual assault by Stratton or provided her with an option other than her own

relocation to address her concerns.

To establish sex discrimination, the *McDonnell Douglas* framework "remains an efficient way

to organize, present, and assess evidence."  *Johnson*, 892 F.3d 887 at 894.  Under this framework,

Wininger must "present evidence that (1) she is a member of a protected class, (2) she was meeting

Forest River's legitimate expectations, (3) she suffered an adverse employment action, and (4)

similarly situated employees outside of her protected class were treated more favorably."  *Fields v. Bd.*

*of Educ. of City of Chicago*, 928 F.3d 622, 625 (7th Cir. 2019).  While the parties do not dispute that

Wininger is a member of a protected class, they do disagree as to whether she was meeting Forest

River's legitimate performance expectations, namely attendance.  This dispute, however, need not be

resolved because Wininger has failed to establish a genuine dispute of material fact as to whether she

suffered an adverse employment action or whether similarly situated employees were treated more

favorably.

### 1.    Adverse Employment Action

The only adverse employment action Wininger alleges is constructive discharge.  There are

two types of constructive discharge that can satisfy the adverse employment element of a Title VII

claim. *Id.* "The first occurs when a plaintiff resigns due to discriminatory working conditions even more egregious than that required for a hostile work environment claim[, and the] second occurs when an employer acts in a manner that would make clear to a reasonable employee that she will be immediately fired if she does not resign." *Id.* (internal quotations and citations omitted). Wininger presents no evidence to suggest that Forest River acted in a manner to communicate to her that she would be fired if she did not resign. So Wininger has waived any argument about the second form of constructive discharge. *See Beavers*, 756 F.3d at 1059.

To establish constructive discharge, an employee must show that the work environment had become intolerable from the objective standpoint of the reasonable employee. *Chapin v. Fort-Rohr Motors, Inc.*, 621 F.3d 673, 679–80 (7th Cir. 2010). In fact, "unless conditions are beyond 'ordinary' discrimination, a complaining employee is expected to remain on the job while seeking redress." *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1015 (7th Cir. 1997); *see also Penn. State Police v. Suders*, 542 U.S. 129, 146–47 (2004). Working conditions have been found extreme enough to establish constructive discharge when they threaten an employee's physical safety. *See, e.g., Chapin*, 621 F.3d at 679 (raised voices and one threat insufficient); *Porter v. Erie Foods Int'l, Inc.*, 576 F.3d 629, 640 (7th Cir. 2009) (repeated threats of physical violence); *Taylor v. W. & S. Life Ins. Co.*, 966 F.2d 1188, 1196–97 (7th Cir. 1992) (supervisor brandished firearm and held to employee's head).

Wininger relies on the same facts she unsuccessfully used to show severe or pervasive harassment to support her argument that her working conditions became so intolerable in March 2021 that she was left with no option but to resign—that she was constructively discharged. Yet as discussed above, Wininger has not established harassment severe or pervasive enough to constitute a hostile work environment. No one challenges her allegations that she suffered anxiety at work after the alleged assault on February 5, 2021, because Stratton still worked nearby, and other employees changed the way they interacted with her. Yet Stratton stopped communicating with her after she

18

reported the incident to Forest River on February 15, 2021. Forest River provided Wininger with an opportunity to relocate her workstation so she would not have to work near Stratton, but she refused the offer. Viewing these facts most favorably to Wininger and accepting her allegations of changed interactions with her co-workers as true, the most that can be said about Wininger's work environment is that she encountered ridicule, but no physical threats, from her co-workers. Moreover, Wininger never reported the allegedly harassing co-worker conduct or her resulting anxiety to Forest River. Her only explanation is that she "could not complain to [her] direct supervisor and Mr. Hillard [sic] and Mr. Evans about the sexual harassment" because Stratton and his family were friends with Forest River bosses and owners. [DE 25-13 at 3]. Yet the Forest River Anti-Harassment Policy, which she received and understood, provided options for reporting to others within the company. Ultimately, she reported her concerns to the Berkshire Hathaway Hotline but not in time for Forest River to learn of them or address them before she quit.

Thus, Wininger has not presented evidence of working conditions more egregious than that required for a hostile work environment. *See Fields*, 928 F.3d at 625. Without such evidence, Wininger cannot show that a reasonable employee facing the same circumstances would have quit immediately rather than seek redress while remaining on the job. *See Perry*, 126 F.3d at 1015. As a result, Wininger has not established a genuine dispute of material fact that she suffered an adverse employment action in the form of constructive discharge.

### 2.    Similarly Situated Employees

Even if Wininger had established constructive discharge, she has not identified any similarly situated employees, outside her protected class, that were treated more favorable. She tries to make the case that Stratton was a similarly situated employee who was treated more favorably in 2018 when he was given more warnings before being fired for attendance issues and when he was rehired twenty months later.

Similarly situated employees must be directly comparable to a plaintiff in all material respects. *Crawford v. Ind. Harbor Belt R. Co.*, 461 F.3d 844, 846 (7th Cir. 2006); *Patterson v. Avery Dennison Corp.*, 281 F.3d 676, 680 (7th Cir. 2002). Whether employees are similarly situated is a "flexible, common-sense, and factual inquiry." *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012). The relevant factors of this inquiry include "whether the employees (i) held the same job description, (ii) were subject to the same standards, (iii) were subordinate to the same supervisor, and (iv) had comparable experience, education, and other qualifications—provided the employer considered these latter factors in making the personnel decision." *Warren v. Solo Cup Co.*, 516 F.3d 627, 631 (7th Cir. 2008) (internal citations and quotations omitted). Employees need not be clones to be similarly situated but they do need to be substantially similar. *Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 916 (7th Cir. 2010).

Wininger and Stratton held different jobs with different responsibilities even though they were both subject to Forest River's employee handbook. While John Hilliard was in the supervisory chain of command for both Stratton and Wininger, he was only Stratton's direct supervisor, not Wininger's. On top of that, nothing in the record shows that these or any other characteristics potentially shared by Stratton and Wininger were used in determining how to respond to Wininger's complaint about the alleged assault. Therefore, it is hard to find that Stratton was similarly situated to Wininger.

If they are similarly situated, however, Wininger's sole argument that Stratton was treated more favorably in 2018 when he had attendance issues is irrelevant to Wininger's sex discrimination claim. To start, she was not even a Forest River employee in 2018. Additionally, Wininger's sex discrimination claim is based on Forest River's alleged failure to address her sexual harassment complaint—not attendance. As a result, Wininger has not presented evidence from which a jury could find that Stratton was a similarly situated employee treated more favorably. By failing to

submit evidence of any other similarly situated employees, Wininger has waived any such arguments. *See Beavers*, 756 F.3d at 1059.

Without sufficient evidence of constructive discharge or similarly situated employees from Wininger, Forest River is entitled to judgment as a matter of law, and summary judgment, on Wininger's Title VII sex discrimination claim. *See Robin*, 200 F.3d at 1088; *Anderson*, 477 U.S. at 248; *Matshushita Elec. Inds. Co.*, 475 U.S. at 587.

### D.    Retaliation

"Title VII forbids employers from retaliating against employees for engaging in statutorily protected activities by opposing an unlawful employment practices or participating in the investigation of one." *Snyear*, 911 F.3d at 884–85. Wininger alleges that Forest River constructively discharged her in retaliation for reporting the alleged sexual assault by Stratton.

A plaintiff may use either a direct or indirect method of proof to establish retaliation. *Id.* at 885. Under the direct method, Wininger "must present evidence that (1) she engaged in a protected activity, (2) she suffered an adverse action, and (3) a causal connection exists between the two." *Id.*; *see also Carter v. Chicago State Univ.*, 778 F.3d 651, 657 (7th Cir. 2015). A plaintiff shows a causal connection by showing that the defendant "would not have taken the adverse ... action but for [her] protected activity." *Baines v. Walgreen Co.*, 863 F.3d 656, 661 (7th Cir. 2017).

The indirect method "allows the plaintiff to establish a *prima facie* case [of retaliation] without establishing a causal link." *Snyear*, 911 F.3d at 885. Consistent with the *McDonnell Douglas* framework used above, a plaintiff using the indirect method must show that "(1) she engaged in a protected activity, (2) she performed her job duties according to her employer's legitimate expectations, (3) she suffered an adverse action, and (4) she was treated less favorably than similarly situated employees who did not engage in the protected activity." *Id.*

As discussed in more detail above, Wininger points to no evidence that she suffered an adverse employment action in the form of constructive discharge or that similarly situated employees who did not report protected activity were treated less favorably. As a result, her retaliation claim is fatally deficient and summary judgment is appropriate.

## III.    CONCLUSION

For the reasons discussed above, Wininger has not established any genuine dispute of material fact or presented sufficient evidence of all elements of her Title VII sexual harassment, sex discrimination, and retaliation claims. As a result, Forest River is entitled to judgment as a matter of law on all Wininger's claims. *See Anderson*, 477 U.S. at 248; *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Robin*, 200 F.3d at 1088. Accordingly, Forest River's motion for summary judgment is **GRANTED**. [DE 22]. The Clerk is directed to enter judgment in Forest River's favor.

SO ORDERED.

August 26, 2024

/s/ *Cristal C. Brisco*
CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT